IN THE UNITED STATES BANKRUPTCY COURT

FOR THE

SOUTHERN DISTRICT OF GEORGIA
Brunswick Division

| | | |
|---|---|---|
| IN RE: | ) | Chapter 7 Case |
| | ) | Number <u>09-21519</u> |
| PAMELLA LYNN KELLER | ) | |
| | ) | |
| Debtor | ) | |
| | ) | |
| DONALD F. WALTON | ) | |
| | ) | |
| United States Trustee/ | ) | |
| Movant | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PAMELLA LYNN KELLER | ) | |
| | ) | |
| Debtor/Respondent | ) | |

## ORDER DISMISSING CASE

This matter comes before me on the motion filed by United States Trustee Donald F. Walton ("Trustee") to dismiss or convert Debtor Pamella Lynn Keller's chapter 7 bankruptcy case. The Trustee argues that dismissal or conversion is warranted under 11 U.S.C. § 707(b)(1) and § 707(b)(3). Based on the totality of the circumstances, I conclude that this chapter 7 filing constitutes abuse. The case is dismissed unless the Debtor converts to a case under chapter 13 within 14 days.[1]

---

[1] The parties have stipulated that the Debtor is eligible for relief under chapter 13. (Dkt. No. 42, ¶ 31.)

## BACKGROUND

### I. Stipulations of Fact[2]

The Debtor filed a voluntary chapter 7 bankruptcy petition on November 13, 2009. She is forty-four years old and has worked as a director/consultant for Knowledge Based Marketing since September 2007. That position requires extensive, regular travel throughout the United States.

The Debtor's anticipated income for the current year is $126,000.00. That translates to a current monthly income of $11,250.00.

The Debtor currently lives in a six-bedroom, 4,900 square-foot house ("Residence") on Saint Simons Island, Georgia, with her three daughters—ages 17, 15 and 12. She and her husband separated in August 2009, and he no longer lives at the Residence. He does not pay alimony or child support, but he does purchase groceries for the Debtor's household in the average amount of $200.00 per month.

The Debtor and her husband purchased the Residence in December 2005, for $825,000.00. The Residence is currently valued by the Glynn County, Georgia, tax assessor at $737,000.00.

---

[2] With the exception of the final paragraph, all of the facts provided in the following section are taken from the parties' joint stipulations of fact. (See Dkt. No. 42.)

2

The Debtor's most recently amended schedules value the Residence at $740,000.00.

Since it is not necessary for Debtor to retain the Residence in order to keep her job, she began to market it in December 2007, with an asking price of $1,000,000.00. As of July 8, 2010, the Residence remained on the market with an asking price of $899,000.00. The Debtor has not received a firm offer on the Residence during the prior two years.

There are two security deeds on the Residence with a combined balance of approximately $745,000.00. The first security deed is held by CitiMortgage, Inc., and the remaining balance is approximately $657,000.00. The regular loan payment on the first security deed—which has been reduced from the original monthly payment of $3,704.00 per month pursuant to the Home Affordable Modification Program ("HAMP")—is $3,293.00 per month. The second security deed is held by Chase Home Mortgage ("Chase") and is in the form of a demand note with a remaining balance of approximately $87,000.00.[3] If amortized over five years, the monthly payment would be approximately $1,510.00. If amortized over fifteen years, the monthly payment would be approximately $741.17. The Debtor has attempted without success to negotiate an agreement with Chase to obtain fixed payments.

---

[3] At hearing, the Debtor testified that she has not made any payments on the second mortgage since she filed this case.

3

The Debtor's average utility bill for the Residence is $879.00 per month, inclusive of a level billing rate for electricity in the amount of $523.00 per month. The average monthly maintenance costs for the Residence are $500.00 per month. In addition, the Debtor pays approximately $50.00 per month for homeowner's association dues and pool maintenance costs.

The Debtor contributes $525.00 per month into a 401(k) account. Prior to filing for bankruptcy, the Debtor made a withdrawal from her 401(k) that she used to make mortgage payments and for household expenses.

In August 2009, the Debtor purchased a 2010 Ford Expedition. The monthly payment on that vehicle is $613.00 per month.

The Debtor currently owes approximately $89,000.00 to her unsecured creditors.

In addition to the foregoing stipulated expenses, the Debtor testified at hearing to the following monthly expenses: $200.00 for cell phones, $140.00 for cable television, $1,500.00-$1,700.00 for food and clothing, $100.00 for laundry and dry cleaning, $150.00 for out-of-pocket medical and dental expenses, $360.00 for transportation costs, $50.00-$100.00 for recreation and entertainment costs, $40.00 for charitable contributions, $38.00 for life insurance, $180.00 for vehicle insurance, $54.00

4

for vehicle taxes and tags, and $200.00-$300.00 for unreimbursed work-related costs.

## II. Procedural Facts

The Trustee filed his motion to dismiss or convert this case on March 15, 2010. (See Dkt. No. 35.) The motion sought dismissal or conversion pursuant to 11 U.S.C. § 707(b)(1) and either § 707(b)(2) or § 707(b)(3). (Id. at 1.)

At hearing, the Debtor was the only witness to testify. The Trustee withdrew his motion to dismiss pursuant to § 707(b)(2) and instead relied on both of the tests set forth in § 707(b)(3).

## DISCUSSION

### I. Overview of 11 U.S.C. § 707(b)(1) and § 707(b)(3).

Under 11 U.S.C. § 707(b)(1), bankruptcy courts may dismiss or convert chapter 7 cases in which "the granting of relief would be an abuse of the provisions of this chapter." 11 U.S.C. § 707(b)(1).[4] Section 707(b)(3) states that, in determining

---

[4] 11 U.S.C. § 707(b)(1) provides:
> After notice and a hearing, the court, on its own motion or on a motion by the United States trustee, trustee (or bankruptcy administrator, if any), or any party in interest, may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts, or, with the debtor's consent, convert such a case to a case under chapter 11 or 13 of this title, if it finds that the granting of relief would be an abuse of the provisions of this chapter. In making a determination whether to dismiss a case under this section, the court may not take into consideration whether a debtor has made, or continues to make, charitable contributions (that meet the definition of "charitable

5

whether abuse is present in a particular case, a court should consider either of two things: "whether the debtor filed the petition in bad faith," 11 U.S.C. § 707(b)(3)(A), or if "the totality of the circumstances . . . of the debtor's financial situation demonstrates abuse," 11 U.S.C. § 707(b)(3)(B).

The burden of proof under § 707(b)(3) is on the United States Trustee, In re Walker, 383 B.R. 830, 836 (Bankr. N.D. Ga. 2008), and the Trustee must set forth sufficient evidence to persuade the court that granting relief would constitute abuse, id.; In re Cribbs, 387 B.R. 324, 332-33 (Bankr. S.D. Ga. 2008).

## II. The Trustee Has Demonstrated Abuse Based on the Totality of the Circumstances.

The primary factor to consider under § 707(b)(3)(B) is the debtor's ability to pay her debts from her future income. In re James, 414 B.R. 901, 914 (Bankr. S.D. Ga. 2008). Although ability to pay is the primary factor, the trustee "must show more than a debtor's ability to fund a Chapter 13 plan." In re Allen, 411 B.R. 913, 921 (Bankr. S.D. Ga. 2009); In re James, 414 B.R. at 914. Courts therefore take into consideration the following additional factors in a totality of the circumstances determination:

---

contribution" under section 548(d)(3)) to any qualified religious or charitable entity or organization (as that term is defined in section 548(d)(4)).

6

> (1) whether the bankruptcy filing was precipitated by an unforeseen or sudden calamity, such as an illness or unemployment;
> (2) whether the debtor is eligible for chapter 13 relief;
> (3) whether the debtor has made any efforts to repay her debts or negotiate with creditors; whether there are non-bankruptcy remedies available to the debtor; or whether the debtor can obtain relief through private negotiations;
> (4) whether the debtor could provide a "meaningful" distribution in a chapter 13 case;
> (5) whether the debtor's expenses could be reduced significantly without depriving her and her dependents of necessities, including whether the debtor's schedules and statement of current income and expenses reasonably and accurately reflect her true financial condition; and
> (6) the period of time over which the debts were incurred; and
> (7) whether the debtor has a stable source of future income.

In re James, 414 B.R. at 914. Having considered each of the foregoing factors, I conclude that, based upon the totality of the circumstances, granting a chapter 7 discharge in this case would be an abuse of the provisions of this chapter.

### A. The Debtor Has the Ability to Pay a Portion of Her Debts.

The Debtor's future income would allow her to pay a significant portion of her debts. I begin this analysis with an examination of the income and expenses listed in the Debtor's schedules. See In re Truax, Ch. 7 Case No. 09-40018, at 6 (Bankr. S.D. Ga. Savannah Div., August 25, 2010) (Davis, C.J.); In re Allen, 411 B.R. at 922-23; In re James, 414 B.R. at 915.

7

The Debtor's Schedule I, filed on November 13, 2009, reflects a monthly gross income of $11,262.00 per month with payroll tax deductions of $3,379.00 per month, resulting in an average net monthly income of $7,883.00. (Dkt. No. 1 at 19.) The Debtor testified, however, that that figure included a bonus that was paid during 2009, but which was not anticipated in 2010. The Debtor anticipates earning only her base monthly gross salary of $10,500.00.

The Debtor's earning statement from January 2010 reflects that her gross earnings for that month were $10,500.00. (Hr'g, July 8, 2010, UST Ex. 2.) The total amount of payroll taxes withheld for the month was $2,496.91 (id.), leaving after-tax net monthly income of $8,003.09. Also withheld was $564.28 in medical and dental insurance and $525.00 in contributions to a 401(k) plan. (Id.) In total, the Debtor's monthly net earnings for the month were $6,913.81. (Id.)

The Debtor's expenses could be reduced in the absence of the high costs associated with the Residence. See In re Truax, supra, at 6 (scrutinizing the expenses claimed by the debtor); In re Allen, 411 B.R. at 923 (same). The Debtor's Schedule J lists monthly Residence-related expenses totaling $5,867.00 ($3,704.00 for the first security deed, $1,648.00 for a second security deed, $150.00 for home maintenance, $300.00 for electricity, and $65.00 for water and sewer charges). (Dkt. No. 1 at 20.)

8

That total is not the actual cost of all Residence-related expenses. The HAMP-reduced payment under the first security deed is $3,293.00. (Dkt. No. 42, ¶ 18.) Although the second security deed is in the form of demand note and the Debtor is not currently making payments on it, she is attempting to negotiate with the lender to finance the note over a fifteen-year period. Such refinancing would result in a monthly payment of approximately $741.17. (Id., ¶ 16). The Debtor is also paying $879.00 per month in utilities (id., ¶ 20), $500.00 per month related to maintenance of the Residence (id., ¶ 21), and approximately $50.00 per month for homeowner's association dues and pool maintenance costs (id., ¶ 22). The total of all Residence-related expenses (assuming payment of the second security deed over a fifteen-year term) is $5,463.17 per month.

The monthly cost of the Residence is excessive for a debtor seeking a chapter 7 discharge. Although "[IRS] standard deductions have no binding power in [a § 707(b)(3)] context, they may provide a baseline for examining what expenses may be excessive." In re Truax, supra, at 8. Here, the cost of the Residence exceeds the standard IRS housing and utility amount of $1,002.00 (as of the time of filing) for a family of four in Glynn County, Georgia, by $4,461.17, or 545%. That expense is unreasonable. See In re Tropper, Chapter 7 Case No. 09-76151-WHD, at 12-13 (Bankr. N.D. Ga. July 19, 2010) (holding a housing

9

cost unreasonable where it exceeded the IRS standard by almost 400%); In re Kreiling, No. 09-21000, 2010 WL 1707501, at *5 (Bankr. D. Wyo. Apr. 26, 2010) (finding a housing cost excessive where it exceeded the IRS standard by over 200%). In addition, the Residence-related costs consume 68% of the Debtor's after-tax net monthly pay ($5,463.17 of $8,003.09), which is an unreasonable percentage. See In re Tropper, supra, at 12 (mortgage payment constituting 44% of monthly net income was excessive and unreasonable).

If the Debtor's expenses were reduced, she would be able to pay a significant portion of her debts. As a starting point, based on the evidence and testimony at hearing, the Debtor is currently operating at a deficit of $2,349.36 per month (the Debtor's net monthly income of $6,913.81 minus $9,263.17 in monthly expenses after all payroll deductions).[5]

The Debtor testified that it would cost approximately $2,500.00 per month to rent a comparable home. Renting would reduce her housing expenses by $2,963.17 per month ($5,463.17 minus $2,500.00). Although the Debtor argued that surrendering

---

[5] The total expense amount is derived from the following monthly expenses to which the Debtor testified: first security deed: $3,293.00; second security deed: $741.17; utilities: $879.00; home maintenance: $500.00; homeowner's association/pool maintenance: $50.00; cell phones: $200.00; cable television: $140.00; food and clothing: $1,600.00 (average); laundry and dry cleaning: $100.00; out-of-pocket medical and dental expenses: $150.00; transportation: $360.00; recreation and entertainment: $75.00 (average); charitable contributions: $40.00; life insurance: $38.00; vehicle: $613.00; vehicle insurance: $180.00; vehicle taxes and tags: $54.00; and unreimbursed work-related costs: $250.00 (average).

10

the Residence would increase her taxes based upon her loss of the home mortgage interest deduction, I find that the "net benefit of reducing the Debtor's housing expense would justify surrendering the [Residence]," In re Tropper, supra, at 13.

The Debtor's monthly contribution of $525.00 per month to a 401(k) constitutes disposable income for the purposes of § 707(b)(3). In re Altman, No. 09-70328-JTL, 2009 WL 5200522, at *9 (Bankr. M.D. Ga. Dec. 22, 2009). This is true despite the fact that 401(k) contributions are not counted toward disposable income in a chapter 13 case. In re Johnson, 346 B.R. 256, 263 (Bankr. S.D. Ga. 2006) (citing 11 U.S.C. § 541(b)(7)(A) & (B)). If contributions to a 401(k) would be the only source of disposable income in a chapter 13 case, then a § 707(b)(3) motion may be denied since exclusion of the contribution from disposable income in a chapter 13 case would preclude the payment of a meaningful dividend to creditors. In re Lavin, 424 B.R. 558, 564-65 (Bankr. M.D. Fla. 2010). That is not the case here.

There are other sources of disposable income from which the Debtor could fund a chapter 13 plan. In addition, the Debtor could forego contributions to her 401(k) during the time in which she is repaying her debts. See In re Tropper, supra, at 11. Although I will not force the Debtor to stop contributing to her 401(k), her present contribution must nonetheless be considered

11

as part of her disposable income for the purposes of this § 707(b)(3) analysis. In re Altman, 2009 WL 5200522, at *9.

In addition, the Debtor's expenses for food, clothing, and related items averages $1,600.00 per month. That amount exceeds the IRS standard of $1,370.00 by $230.00. The Debtor also pays $1,207.00 per month in vehicle-related expenses, $517.00 more than the $690.00 IRS standard for transportation costs with one vehicle.

If the Debtor were to surrender the Residence and reduce other excessive expenses, she would have the ability to repay a sizable portion of her debts. By reducing her housing costs to $2,500.00 by renting; postponing payments to her 401(k) plan; and reducing her food, clothing, and transportation expenses to the levels of the IRS standards for Glynn County, Georgia, the Debtor would have a monthly net income of $1,885.81. Payments in that amount over a 60-month chapter 13 plan would total $113,148.60. Assuming that the second security deed would become unsecured upon surrender of the Residence, the Debtor's total maximum unsecured debts would be approximately $176,606.00 ($89,606.00 in scheduled unsecured debt plus the balance of $87,000.00 on the second security deed). Paying $113,148.60 toward those unsecured debts would yield a significant dividend of approximately 64% to unsecured creditors. See In re James, 414 B.R. at 915 (holding that a 24.5% dividend on a claim of $24,026.40 is not

12

"insubstantial"). While I need not require that the Debtor reduce her expenses to the foregoing levels, I find that her current expenses are excessive (especially those related to the Residence) and that they mask the fact that she does have the ability to pay her creditors a significant portion of the amount she owes them.

### B. The Relevant Additional Factors Suggest Abuse.

First, the Debtor's financial situation was not caused by any "unforeseen or sudden calamity" such as illness, disability, or unemployment (factor 1). See In re Allen, 411 B.R. at 923. The Debtor and her husband have separated, with the result that a household that could be supported on two salaries can no longer be supported on one. As the Trustee points out, the Debtor's difficult financial situation is the result of the Debtor's choice to remain in the Residence and maintain her lifestyle and not of any unforeseen or sudden calamity.

Second, the parties have stipulated that the Debtor is eligible for relief under chapter 13 (factor 2). She has a steady source of income and earns $126,000.00 per year (factor 7). As discussed above, the Debtor has the ability to reduce her expenses, and there is no evidence to indicate that cutting back on her housing, food and clothing, and vehicle expenses would deprive her and her children of any necessities (factor 5).

13

Rather, reducing her expenses would allow the Debtor to pay a "meaningful" dividend to her unsecured creditors (factor 4).

Finally, the purchase of a 2010 Ford Expedition shortly before her bankruptcy filing is indicative of abuse (factor 6). Rather than attempt to rein in her expenses, she actually increased them, having testified that her monthly payment on the Expedition exceeds the monthly payment on her previous vehicle by approximately $50.00.[6]

In short, the Debtor wishes to maintain her current lifestyle at the expense of her unsecured creditors without making an effort to reduce her expenses.[7] See In re Truax, supra, at 9 ("[W]hile a debtor is not required to live in poverty to defeat a § 707(b) action to dismiss, a debtor may still be required to engage in some good, old-fashioned belt tightening."). Therefore, based on the totality of the circumstances, I conclude that this filing constitutes abuse under § 707(b)(3)(B).[8]

---

[6] The other additional factor—whether the debtor has made any efforts to repay her debts or negotiate with creditors or whether she has other nonbankruptcy avenues of relief (factor 3)—has no impact on this determination. Although the Debtor has attempted to negotiate an extended payment plan on the second security deed, her housing costs remain so excessive that such renegotiation of the terms of the note would not increase her ability to pay all of her Residence-related expenses.

[7] The Debtor testified that her only effort to explore less costly housing consisted of perusing classified advertisements in the local newspaper and that she had not contacted any potential landlord.

[8] Since I find this filing to be abusive under § 707(b)(3)(B), I need not address whether the case was filed in bad faith under § 707(b)(3)(A).

14

## CONCLUSION

The Debtor's chapter 7 bankruptcy filing constitutes abuse under 11 U.S.C. § 707(b)(1) and § 707(b)(3)(B). **IT IS THEREFORE ORDERED** that the Debtor's case is **DISMISSED** unless she converts to a case under chapter 13 within 14 days of this date.

_____
JOHN S. DALIS
United States Bankruptcy Judge

Dated at Brunswick, Georgia,
this ____ day of September, 2010.

15